A05A0194. MEDICAL CENTER OF CENTRAL GEORGIA, INC.
et al. v. LANDERS et al.
(616 SE2d 808)

ELLINGTON, Judge.

Donald Landers brought this negligence action against his employer and against the doctor who performed his employment medical examination after both the employer and the doctor failed to advise Landers of the results of his chest x-ray. The trial court denied the doctor's motion for summary judgment, finding that, under regulations adopted to implement the Occupational Safety and Health Act of 1970, 29 USC § 651 et seq., an employment examiner owes a duty to inform an examinee directly of all the results of an employment medical examination, including chest x-ray results which are not available until after the conclusion of the physical examination. Pursuant to the grant of his application for interlocutory review, the doctor appeals, contending he is entitled to judgment as a matter of law because an employment examiner owes no legal duty to an examinee. In addition, the doctor contends that Landers' employer's failure to provide Landers a copy of the x-ray report constitutes an intervening cause, entitling him to summary judgment. For the following reasons, we reverse.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A defendant may do this by showing the court that the documents, affidavits, depositions, and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). In reviewing the grant or denial of a motion for summary judgment, we apply a de novo standard of review and

consider the evidence with all reasonable inferences therefrom in favor of the party opposing summary judgment.

(Citation omitted.) *Scott v. Cushman & Wakefield &c.*, 249 Ga. App. 264, 264-265 (547 SE2d 794) (2001).

The record shows the following undisputed facts. For about 20 years, Landers worked for North Brothers, Inc. and NB Environmental, Inc. (collectively, "North Brothers") as an insulation installer. As part of his job, Landers handled asbestos materials. Beginning in the early 1990s, North Brothers, in accordance with OSHA regulations, required Landers to submit to a yearly medical examination with a physician it chose and compensated. At the relevant time, North Brothers had a contract with Work Horizons, an occupational medicine practice, to perform employment medical examinations. The purpose of the required examination was to examine each asbestos worker for signs of asbestos-related diseases such as lung cancer and to certify that he was physically capable of using a negative-pressure respirator. On January 29, 1998, Vincent Greico, a Work Horizons doctor, performed Landers' annual employment medical examination which included a chest x-ray, pulmonary function or lung capacity test, and a physical examination of his upper body. Landers described the examination as brief and "limited," consisting of the doctor asking how he felt, listening to his lungs and chest, and looking in his throat and ears. At the conclusion of the exam, Greico told Landers his pulmonary function test and physical examination were fine and gave Landers a written report titled "Physician's Opinion" to take to North Brothers. In that document, Greico indicated that he had detected no medical conditions "that would place [Landers] at an increased risk of material health impairment from his planned 'exposure to asbestos'" and that Landers was cleared to wear a respirator. Greico further certified that he informed Landers of the results of the examination and of any medical conditions that may result from asbestos exposure. Upon his return to work, Landers' supervisor told him that he "passed" the medical examination and was cleared to use a respirator.

In accordance with Greico's routine practice, Landers' x-ray was delivered to Work Horizons' affiliated hospital to be evaluated by a qualified "B-reader" or Board-certified radiologist.[1] The day after Landers' physical examination, a radiologist examined Landers' x-ray, noted a "vague opacity" in Landers' lung, and recommended

---

[1] See 29 CFR § 1926.1101, Appendix E (OSHA regulation requiring interpretation of chest x-rays "by a B-reader, a board eligible/certified radiologist, or an experienced physician with known expertise in pneumoconioses").

"fluoroscopy to clarify the x-ray and to exclude parenchymal nodule." This was a serious finding for a patient who worked with asbestos, a known carcinogenic agent, and possibly indicated a life-threatening problem. Greico received this report and prepared a notice to North Brothers quoting the radiologist's findings and recommendation and indicating that Landers needed follow up with his personal physician. Despite his intention of notifying Landers of the radiologist's findings and recommendation, and despite having Landers' home telephone number and address on file, Greico took no action to relay the radiologist's report directly to Landers. Greico expected North Brothers to give Landers a copy of the notice.[2] North Brothers personnel, however, put the notice in Landers' personnel file without providing a copy to Landers.

A year later, Greico again performed Landers' annual medical examination, which included a chest x-ray. Without referring to Landers' 1998 chest x-ray or the radiologist's report during the examination, Greico cleared Landers to wear a respirator. Within a few days, Greico received a report on Landers' 1999 chest x-ray that again showed a spot on Landers' lung. Greico telephoned North Brothers to speak to Landers. Greico told Landers about the results of his most recent chest x-ray, and asked him what he had done about the situation since the 1998 x-ray. Alerted to the spot on his lung for the first time, Landers sought medical care and learned he had advanced lung cancer.

Landers brought this action for damages, and his wife asserted a claim for loss of consortium, against Greico and Greico's employer, the Medical Center of Central Georgia, Inc. and Central Georgia Health Systems, Inc., jointly doing business as Work Horizons (collectively, "Greico"),[3] as well as against North Brothers.[4] Landers alleges that the one-year delay in the diagnosis of his lung cancer allowed the disease to worsen, made treatment more difficult, and made the prognosis for successful treatment less favorable. After a hearing, the trial court denied Greico's motion for summary judgment, finding that Greico owed Landers a legal duty pursuant to OSHA regulations and that questions of material fact remained regarding whether Greico breached that duty.

---

[2] See Division 1 (a), infra, discussing 29 CFR § 1926.1101 (m) (4) (iii).

[3] Landers also named as a defendant Gary H. Lebow, another Work Horizons doctor, who examined Landers in earlier years. There appears to be no allegation that Lebow personally performed any act relevant to Landers' 1998 exam.

[4] In earlier proceedings, the trial court granted North Brothers' motion for summary judgment.

1. In related arguments, Greico contends he is entitled to judgment as a matter of law because Landers failed to set out facts supporting the first element of a negligence claim, a duty of care.[5]

(a) Greico contends that OSHA regulations cannot support a finding of a legal duty because the regulations impose duties only on employers. We agree.

In this regard, Landers' theory of recovery is grounded in the federal Occupational Safety and Health Act, 29 USC § 651 et seq.; an OSHA regulation concerning toxic and hazardous substances, 29 CFR 1926.1101; and OCGA § 51-1-6.[6] In adopting the Act, Congress intended "to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources" by, inter alia, "providing medical criteria which will assure insofar as practicable that no employee will suffer diminished health, functional capacity, or life expectancy as a result of his work experience." 29 USC § 651 (b) (7).

As part of this scheme, the Secretary of Labor adopted a regulation providing for medical surveillance of workers who are required to wear negative-pressure respirators and whose work exposes them to a specified amount of asbestos. 29 CFR § 1926.1101 (m) (1). The regulation requires every employer with such employees to institute a medical surveillance program under which the employer provides, at its expense, examinations by a physician. 29 CFR § 1926.1101 (m) (2) (i). A medical examination must be provided before the employee begins working in the area where negative-pressure respirators are worn or where exposure to asbestos may be at or above a certain limit and at least annually thereafter. Id. Such an examination must include the following: a medical and work history "with special emphasis directed to the pulmonary, cardiovascular, and gastrointestinal systems"; a specified questionnaire which addresses many aspects of exposure to respiratory hazards;[7] a physical examination "directed to the pulmonary and gastrointestinal systems," including

---

[5] See *Brown v. All-Tech Investment Group*, 265 Ga. App. 889, 893 (1) (595 SE2d 517) (2004) ("To state a cause of action for negligence under Georgia law, the following elements are essential: (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.") (citation omitted).

[6] OCGA § 51-1-6 provides: "When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby."

[7] See 29 CFR § 1926.1101 (m) (2) (ii), Appendix D (mandatory medical questionnaires for employees exposed to asbestos).

a chest x-ray, pulmonary function tests; and "[a]ny other examinations or tests deemed necessary by the examining physician." 29 CFR § 1926.1101 (m) (2) (ii) (A), (C), (D). The regulation provides in pertinent part:

> The employer shall obtain a written opinion from the examining physician [which] shall contain the results of the medical examination and [which] shall include:
>
> (A) The physician's opinion as to whether the employee has any detected medical conditions that would place the employee at an increased risk of material health impairment from exposure to asbestos;
>
> (B) Any recommended limitations on the employee or on the use of personal protective equipment such as respirators; and
>
> (C) A statement that the employee has been informed by the physician of the results of the medical examination and of any medical conditions that may result from asbestos exposure. . . .

29 CFR § 1926.1101 (m) (4) (i). The regulation commands: "[t]he employer shall provide a copy of the physician's written opinion to the affected employee within 30 days from its receipt." 29 CFR § 1926.1101 (m) (4) (iii).

Landers contends these regulations impose duties, not only on employers, but also directly upon physicians hired as employment examiners. Landers argues that violation of these duties may give rise to a cause of action under OCGA § 51-1-6. As we have stated,

> We have no doubt that OSHA regulations by definition constitute as much a duty under the law and are as enforceable as the laws authorizing their creation and promulgation (see 29 USCA § 651 et seq.), and breach of those regulations is a violation of law. They should be admissible not merely as "standards" of performance, but as evidence of legal duty, violation of which may give a cause of action under OCGA § 51-1-6.

*Cardin v. Telfair Acres of Lowndes County*, 195 Ga. App. 449, 450 (2) (393 SE2d 731) (1990). But we agree with Greico that the OSHA regulation at issue here, 29 CFR § 1926.1101 (m), does not create

legal duties running from physicians who perform employment examinations to examinees. First, § 1926.1101 (m) (4) (i) provides "[t]he employer shall obtain a written opinion from the examining physician" hired for the employer's mandatory medical surveillance program. Thus, by the regulation's plain terms, it is an employer who fails to obtain the opinion — not the physician who fails to produce such an opinion — who risks being sanctioned.[8] We find no authority indicating that the federal government can enforce this OSHA regulation against occupational medicine examiners.

Further, as we have recognized, the Occupational Safety and Health Act and OSHA regulations create duties only within the context of the employer-employee relationship. *Brantley v. Custom Sprinkler Systems*, 218 Ga. App. 431, 432 (1) (461 SE2d 592) (1995); *Dupree v. Keller Indus.*, 199 Ga. App. 138, 141 (1) (404 SE2d 291) (1991).[9] We find no authority supporting Landers' position that the Act and OSHA regulations impose legal duties on parties other than employers.[10] Because Greico, as the independent physician performing an examination required by 29 CFR § 1926.1101 (m), was a stranger to Landers' relationship with his employer, Landers cannot rely on that regulation as the source of a legal duty in his negligence action against Greico. Cf. *Styles v. Mobil Oil Corp.*, 218 Ga. App. 48, 49-50 (2) (459 SE2d 578) (1995) (subcontractor's employee could

---

[8] The Act "imposes a duty on employers and provides for enforcement of that duty by criminal sanctions, civil penalties recoverable by the United States . . . and, under certain circumstances, injunction of the violation of the duty by a district court acting upon application of the Secretary of Labor." *Jeter v. St. Regis Paper Co.*, 507 F2d 973, 976 (5th Cir. 1975).

[9] See also *Long Leaf Indus. v. Mitchell*, 252 Ga. App. 343, 346-347 (3) (a) (556 SE2d 242) (2001) (holding that, because OSHA regulations did not apply to landowner who hired plaintiff's employer for a welding job, OSHA violations did not establish negligence per se but holding that evidence of the employer's nonconformity with OSHA standards was admissible as evidence of the landowner's superior knowledge of a defect); *Barrera v. E. I. Du Pont De Nemours and Co.*, 653 F2d 915, 920 (5th Cir. 1981) (OSHA regulations create duties only between employers and their employees, not between landowners and employees of independent contractors doing work on the premises); *Jeter v. St. Regis Paper Co.*, 507 F2d at 976 (accord).

[10] See cases discussed in "Violation of OSHA Regulation as Affecting Tort Liability," 79 ALR3d 962, § 5. Landers particularly relies on *Cardin v. Telfair Acres of Lowndes County*. In that case, we noted that OSHA enforcers placed the blame for a collapsed trench on the decedent's employer and not on the independent contractor which was hired to supply and operate an excavator to shore and slope the trench. 195 Ga. App. at 450 (2). Landers reads this case to suggest that the OSHA regulations imposed a duty of care on the independent contractor as to the decedent. Cases applying *Cardin v. Telfair Acres*, however, have made it clear that the holding was not so broad. See *Brantley v. Custom Sprinkler Systems*, 218 Ga. App. at 432 (1) (because plaintiff, a city employee, was not an employee of the independent contractor the city hired to construct a wastewater treatment pumping station, OSHA regulations were not evidence that the independent contractor owed the plaintiff any legal duty); *Dupree v. Keller Indus.*, 199 Ga. App. at 141 (1) (because the plaintiffs were not employees of the company which sold an industrial press to the plaintiffs' employer, OSHA regulations could not provide a basis for finding the seller owed the buyer's employees any legal duty).

pursue cause of action against landowner if owner ratified contractors' conduct which violated OSHA regulations). Accordingly, the trial court erred in denying Greico's motion for summary judgment on this basis.

(b) Greico contends he is entitled to judgment as a matter of law on the basis that the undisputed facts show that there existed no doctor-patient relationship from which a duty of care would arise. Again, we agree.

The essential elements to establish liability in a medical malpractice action are "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." (Citations and punctuation omitted.) *Zwiren v. Thompson*, 276 Ga. 498, 499 (578 SE2d 862) (2003). See OCGA § 51-1-27 (cause of action for medical malpractice).

> Georgia law is clear that physician-patient privity is an absolute requirement for the maintenance of a professional malpractice action. It is a well-settled principle of Georgia law that there can be no liability for malpractice in the absence of a physician-patient relationship. In such cases, called classic medical malpractice actions, doctor-patient privity is essential because it is this relation which is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct. The relationship is considered consensual where the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient.

(Citations and punctuation omitted.) *Schrader v. Kohout*, 239 Ga. App. 134, 135-136 (522 SE2d 19) (1999).[11] "[W]hen an employer retains a physician to examine an employee, no physician-patient relationship exists between the employee and the physician . . . because[,] in such a situation, the physician has neither offered nor intended to treat, care for, or otherwise benefit the individual." (Citations and punctuation omitted.) *Payne v. Sherrer*, 217 Ga. App. 761, 762-763 (1) (458 SE2d 916) (1995).[12]

---

[11] See cases discussed in Stacy J. Bagley, "Enough is Enough! Congress and the Courts React to Employers' Medical Screening and Surveillance Procedures," 99 Dick. L. Rev. 723, 735-739 (Spring 1995), and Judith Richter, "Taking the Worker as You Find Him: The Quandary of Protecting the Rights as well as the Health of the Worker with a Genetic Susceptibility to Occupational Disease," 8 Md. J. Contemp. Legal Issues 189, 203 (Spring-Summer 1997).

[12] See cases discussed in "What Constitutes Physician-Patient Relationship for Malpractice Purposes," 17 ALR4th 132, § 10.

Landers contends in this case Greico did "assume the role of treating" him, giving rise to a doctor-patient relationship, because, inter alia, Greico's examination exceeded the scope requested by the employer and required by OSHA. Specifically, Landers points to his testimony that in earlier years the examination had included a digital prostate check and that Greico might have performed one in 1998. Pretermitting whether a prostate check exceeded the scope of the examination required by OSHA regulations,[13] the undisputed evidence shows that both Landers and Greico intended and understood the examination to be nothing more than a limited OSHA examination. Landers did not complain of any symptoms, nor did he request any tests, treatment, or advice in addition to what Greico gave as a routine part of the required examination. Landers did not ask about the results of any of the tests and did not even read the physician's statement he was given to deliver to North Brothers. Landers identified no evidence that Greico demonstrated any intention to treat, care for, or otherwise benefit Landers. Under these circumstances, a doctor-patient relationship did not arise as a matter of law. See *Payne v. Sherrer*, 217 Ga. App. at 762-763 (1) (no physician-patient relationship created where employer retained the physician and required a medical examination before allowing examinee to return to work); *Peace v. Weisman*, 186 Ga. App. 697, 699 (2) (368 SE2d 319) (1988) (no physician-patient relationship created where the State retained the physician and required a medical examination to determine examinee's ability to work before paying disability benefits). Cf. *Harris v. Griffin*, 272 Ga. App. 216, 219 (612 SE2d 7) (2005) (physician-patient relationship created where patient seeking referral to a specialist for back pain completed family practitioner's new patient form and "consent to treatment" and doctor examined patient, took her medical history, diagnosed her, made several calls to get her an appointment with a specialist, and billed Medicare for the visit). In the absence of a physician-patient relationship, Landers cannot maintain a medical malpractice action against Greico. *Schrader v. Kohout*, 239 Ga. App. at 135-136; *Peace v. Weisman*, 186 Ga. App. at 699 (1). Accordingly, we reverse the trial court's denial of Greico's motion for summary judgment on Landers' malpractice claim.

(c) By this holding, we do not imply that physicians who examine employees at the request of and for the benefit of employers, and who thereby place themselves outside the traditional physician-patient relationship, can never be found to owe any legal duty to the examinees in question.[14] But the issues of whether Landers' complaint can

---

[13] See 29 CFR § 1926.1101 (m) (2) (i) (requirements of medical examination).

[14] See *MCG Health v. Casey*, 269 Ga. App. 125, 128 (603 SE2d 438) (2004) (complaint stated

be construed as setting forth a claim against Greico for simple negligence,[15] and whether such claim would survive a motion for summary judgment, were not presented to and decided by the trial court. Accordingly, the issue is not ripe for our review. *Solomon v. Barnett*, 269 Ga. App. 779, 782 (3) (605 SE2d 599) (2004).

2. Greico contends the employer's failure to provide Landers a copy of the notice regarding the radiologist's findings and recommendation constituted an intervening cause and, therefore, he is entitled to judgment as a matter of law.

"In order to state a cause of action for negligence, a plaintiff must establish the essential elements of duty, breach of duty, and proximate cause that amounts to a legally sufficient causal connection between the conduct alleged and the resulting injury." (Footnote omitted.) *CSX Transp. v. Deen*, 269 Ga. App. 641, 643 (1) (605 SE2d 50) (2004). "If an injury would have occurred notwithstanding alleged acts of negligence of the defendant, there could be no recovery, in an action for negligence." (Footnote omitted.) *Ga. Pipe Co. v. Lawler*, 262 Ga. App. 22, 26 (2) (584 SE2d 634) (2003). "[F]or an intervening act of

---

a claim in simple negligence where plaintiff alleged that, following neck surgery, doctor negligently threw plaintiff's arm in an upward motion during a grip strength test); *Peterson v. Columbus Med. Center Foundation*, 243 Ga. App. 749, 755 (2) (533 SE2d 749) (2000) (complaint stated a claim in simple negligence where plaintiff alleged generally that health care providers were negligent "in failing to follow adequate policies or procedures regarding the reading, interpretation and communication of medical tests"); *Hillhaven Rehabilitation &c. v. Patterson*, 195 Ga. App. 70, 72 (2) (392 SE2d 557) (1990) (complaint stated a claim in simple negligence where plaintiff alleged that nursing home staff was negligent in failing to assist ailing patient in getting in and out of bed and similar administrative acts); *Peace v. Weisman*, 186 Ga. App. at 703-706 (Benham, J., dissenting) (discussing Restatement, Torts, § 325 and cases finding potential liability for doctors in the absence of a traditional doctor-patient relationship). Cf. *Herndon v. Ajayi*, 242 Ga. App. 193, 194 (2) (532 SE2d 108) (2000) (complaint did not state a claim in simple negligence where patient alleged physician was negligent in failing to inform him that a stent was left in his ureter after treatment for a kidney stone and in failing to call him when he did not keep an after-care appointment to remove the stent); *Peace v. Weisman*, 186 Ga. App. at 699 (2) ("In the absence of a physician-patient relationship, the [doctor's] only duty to [an examinee is] to conduct the examination in such a manner as not to injure him.") (citations and punctuation omitted). See generally cases discussed in Stacy J. Bagley, "Enough is Enough! Congress and the Courts React to Employers' Medical Screening and Surveillance Procedures," 99 Dick. L. Rev. at 735-739.

[15] We note that in this case a primary purpose of the examination was to examine an asbestos worker for signs of asbestos-related disease and that the physician purportedly undertook to inform the worker of the results of the examination. Among other conduct, Landers traces his injury to Greico's failure to communicate at the conclusion of the physical examination the preliminary nature of the results then available and his failure to relay to Landers directly the later-received radiologist's analysis and recommendation that Landers receive fluoroscopy. See *MCG Health v. Casey*, 269 Ga. App. at 128 (a professional negligence claim calls into question the conduct of the professional in his area of expertise and requires the exercise of professional judgment and skill; administrative, clerical, or routine acts demanding no special expertise fall in the realm of simple negligence). In opposing summary judgment, Landers clarified that one of his theories of recovery is that Greico "had a general duty not to subject him to an unreasonable risk of harm," apart from any duty arising out of a doctor-patient relationship.

a third party to become the sole proximate cause of a plaintiff's injuries, the intervening act must not have been foreseeable by defendant, must not have been triggered by defendant's act, and must have been sufficient by itself to cause the injury." (Punctuation and footnote omitted.) *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686 (2) (572 SE2d 533) (2002).

Because Landers failed to identify the essential element of a duty underlying his claims based on OSHA regulations and medical malpractice, see Division 1 (a) and (b), supra, Greico's argument concerning an intervening cause is moot as to those claims. Because Greico's motion for summary judgment did not challenge any other claims, see Division 1 (c), supra, the issue of an intervening cause as to any such claim is not ripe for our review.

*Judgment reversed. Smith, P. J., concurs. Adams, J., concurs fully with the majority and concurs specially.*

ADAMS, Judge, concurring fully and specially.

I write separately as to the issue addressed in Division 1 (b) to point out that several other jurisdictions who have considered this issue have imposed a limited duty on physicians performing occupational medical screenings even in the absence of a traditional physician-patient relationship. As recently analyzed by the Arizona Supreme Court:

> Many courts treat the existence of a formal doctor-patient relationship as merely one factor to consider in analyzing whether a duty should be imposed. . . . Other courts examine the extent of the relationship and the type[s] of tests conducted by the doctor to determine the extent of the duty, or what we would call the standard of care. *E.g., Cleghorn v. Hess*, 109 Nev. 544, 853 P2d 1260, 1263-1264 (Nev. 1993). To determine whether a duty exists, some courts consider such factors as whether the doctor was in a unique position to prevent harm, the burden of preventing harm, whether the plaintiff relied upon the doctor's diagnosis or interpretation, the closeness of the connection between the defendant's conduct and the injury suffered, the degree of certainty that the plaintiff has suffered or will suffer harm, the skill or special reputation of the actors, and public policy. *E.g., Parsons v. Crown Disposal Co.*, 15 Cal. 4th 456, 63 Cal. Rptr. 2d 291, 936 P2d 70, 80 (Cal. 1997). These are appropriate inquiries that illuminate the concerns that motivate tort liability.

*Stanley v. McCarver*, 92 P3d 849, 853 (Ariz. 2004).

The Arizona court is not alone in adopting this or a similar approach. See *Betesh v. United States*, 400 FSupp. 238, 245-247 (D.C. 1974) (finding duty existed under Maryland law for radiologist hired by employer to report abnormalities to the employee); *Daly v. United States*, 946 F2d 1467, 1468 (9th Cir. 1991) (finding duty existed under Washington law for doctor to report abnormal results obtained during pre-employment exam despite absence of doctor-patient relationship); *Reed v. Bojarski*, 764 A2d 433, 443 (N.J. 2001) (finding absence of traditional physician-patient relationship is simply one factor to consider in determining duty of examining doctor).

Although I favor the balanced approach expressed in these opinions, in light of our well-established precedent in this area, I fully concur in the majority opinion.

## ON MOTION FOR RECONSIDERATION.

In an opinion issued June 2, 2005, this Court reversed the trial court's denial of the defendants'/appellants' motion for summary judgment. The appellees, Donald and Mary Landers, filed a motion for reconsideration. Pursuant to Court of Appeals Rule 37 (e),

A reconsideration will be granted on motion of the requesting party, only when it appears that the Court overlooked a material fact in the record, a statute or a decision which is controlling as authority and which would require a different judgment from that rendered, or has erroneously construed or misapplied a provision of law or a controlling authority.

The appellees' entire argument in support of their motion consists of the following: "It appears that there is a basis for granting this Motion for Reconsideration pursuant to Rule 37 (e)." Because the appellees fail to make *any* attempt to state a basis for granting the motion under the applicable standard, we hereby determine the motion to be frivolous. Accordingly, we deny the motion for reconsideration and assess penalties in the amount of $500 against appellees' counsel pursuant to Court of Appeals Rule 15 (b).

*Motion for reconsideration denied.*

DECIDED JUNE 2, 2005 —
RECONSIDERATION DENIED JUNE 29, 2005.

*Pursley, Lowery & Meeks, Kevin B. Buice, Norah M. White*, for appellants.

*Friedman & Martin, Stanley H. Friedman, Janna Martin*, for appellees.